**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DARLENE BENNETT,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-22-2972** |
| **GINA RAIMONDO,** | * | |
| **SECRETARY, UNITED STATES** | | |
| **DEPARTMENT OF COMMERCE** | * | |
| **Defendant.** | * | |

**MEMORANDUM OPINION**

Darlene Bennett says she was removed from her position with the Department of Commerce in December 2020 because she previously had filed several Equal Employment Opportunity ("EEO") complaints and an employment discrimination lawsuit against her supervisors. The agency says it removed Bennett because she refused to complete a simple, time-sensitive, mission-critical task that she had done many times before. Bennett appealed the removal decision to the Merit Systems Protection Board ("MSPB"), and the MSPB affirmed the agency's decision. Bennett now appeals the MSPB's decision to this Court and asserts a Title VII retaliation claim against the agency. The agency has moved to dismiss or, in the alternative, for summary judgment. ECF 18. The motion is fully briefed. ECF 18-1, 22, 30. A hearing is not necessary. *See* Loc. R. 105.6. The agency's motion, treated as a motion for summary judgment, is granted.

I.    **Factual and Procedural Background**

A.  **Bennett's Removal**

Bennett worked as a program support specialist for the Operations and Regulatory Services Division ("ORSD"), a division within the National Oceanic and Atmospheric Administration's

("NOAA") Office of Sustainable Fisheries ("OSF"). ECF 18-4, at 2. NOAA is a part of the Department of Commerce. *Id.* Bennett's responsibilities included preparing and processing procurement documents, carrying out "routine administrative assignments . . . under supervisory instructions on objectives, limitations, priorities, and deadlines," and assisting "higher-level specialists in more complex activities." *Id.* Bennett was at times assigned "complex and mission critical" tasks concerning contracts within the agency because she held the highest-level certification available, a Contracting Officer Representative Level III certification. ECF 18-5, at 2.

The events that precipitated Bennett's December 2020 removal from her position occurred over the course of two days in September 2020. On September 14, 2020, at 2:55 p.m., Bennett's supervisor, Jafnar Gueye, emailed Bennett asking her to add funding to the Automated Fisheries Contract (the "contract"), which was set to expire on September 16 at 11:59 p.m. *See* ECF 18-6, at 2; ECF 18-7. This contract maintained the National Fishing Permit and Landing Reporting System, which allows fishermen to request fishing permits for highly migratory species and to report their catches online, both of which are regulatory requirements of the Magnuson-Stevens Fishery Conservation and Management Act. ECF 18-6, at 2. If the contract were to lapse, fishermen would not be able to update their fishing quota accounts, which would limit fishing opportunities and restrict fishery monitoring efforts, and the agency would not be able to receive important fisheries trade data. *Id.* Because Bennett created the original purchase request ("PR") for the contract, Gueye asked her to complete the funding modification. *Id.* at 3. Gueye noted that during his tenure Bennett had been assigned and completed 11 PRs. *Id.* at 4. Bennett acknowledged she knew how to complete this task. *See* ECF 18-9, at 6 ("I did not need for Jafnar to show me how to do anything.").

On September 15, at 7:03 a.m., Bennett emailed Gueye:

You have the T&M broken down into percentages. Which accounting as it relates to the dollar amount for T&M. There are four accountings listed for T&M. Pls clarify. Also, I wanted to ask you if this PR was a contract for OSF? I noticed that the accounting that I included on the PR has been changed to an accounting that is not Fisheries.

ECF 18-7, at 2.

At 8:47 a.m., Gueye responded, in part:

I'm unclear on what you're asking as it relates to percentage. You're increasing the dollar amount for the SF accounting. This will of course mathematically change the relative percentage accordingly. . . . You're working on the Automated [F]isheries PR, correct? I want to make sure we're talking about the same PR . . . because your questions are making me doubt that we are.

*Id.* at 3. In the same email, Gueye told Bennett the request was "time-sensitive as the award is

supposed to be made hopefully today or tomorrow so we need this PR sent back before COB today.

If for some reason you're unable to add the funding, I'll do so once you release the PR to me." *Id.*

Bennett responded at 8:47 a.m., stating, in part:

As it relates to the accounting that you, you requested to add $140,000 to the contract. However, you broke the dollar amount into percentages. I need to know where you want the $140,000 added. Every time there is a change to a PR I have to keep going back and forth with either yourself, Tyler or Morgan to pull information about the change that is needed. I feel that is being done on purpose. See below what I am speaking of and provide guidance on where you want this dollar amount added.

*Id.*

At 10:19 a.m., Gueye responded, in part:

Look at the accounting sheet. You obviously added the $140,000 to the LIN since I can see it's funded at 92% now per your screenshot. You didn't add the accounting line yet which is why you're still short of 100%. I didn't breakdown the funding in percentages, the system does it automatically. Once you add the accounting that Tyler gave you (by creating a new accounting line with the information and amount and adjusting the quantity accordingly), you will be 100% funded.

I can tell that you don't fully understand how the accounting menu works in [the program] and that's ok. I assume that is why you think information is being kept

from you when you have all the information you need but just don't know how to adjust the funding in the system correctly. I can walk you through it so you know in the future. I just can't edit the PR because it's not shared with me. I've had to train a half dozen people on it because it's built in a somewhat clumsy way. So if you want me to show you, share the PR and I'll take screenshots of my edits.

*Id.* at 4.

Six minutes later, Bennett responded, "Your instructions are never clear, and I believe that is on purpose." *Id.* She then asked, "which line of the T&M the $140,000 should go." *Id.* Three minutes later, she emailed, "I do fully understand what is being requested. Please state where or which line of the T&M you want the additional funds $140,000 added?" *Id.*

At 1:01 p.m., Gueye emailed Bennett highlighted and labeled screenshots and stated, "Here is a step by step guide to what you need to do to add an accounting line in [the software]. If for some reason you are unable to follow the steps, release the PR to me and I'll do it myself." *Id.* at 5–6.

At 2:17 p.m., Bennett wrote:

I believe you are getting confused with my question. I understand completely but I will not simply assume how much should go where. This needs to get done today and we are wasting valuable time going back and forward and nothing is getting accomplished. Pls with all do [sic] respect explain how you want this money allocated and broken down? You likely had a discussion with these offices on how much money each office would provide per their accounting. I was not included in those meetings and therefore cannot answer that very important question. You stated that you want the money added to T&M but you did not say how it should be allocated or if a new line should be added. I will not assume and add money to my discretion so that I am blamed for carrying out a wrong action. How do you want this broken up for the 5th time? How much should go to each? Only you know how you want this broken down. I don't know why this is such a hard question to respond to?

*Id.* at 7.

At 2:35 p.m. Gueye wrote:

I have given you screenshots and a step by step of exactly what I need you to do. If you can't do so in the next 30mn I'll recreate the PR and do so myself and we'll deal with the issue separately. There are no discussions or meetings. I have given

you clear click by click picture instructions of what I need you to do. I need you to add that funding to that PR as outlined in the screenshots, I cannot be any clearer. I assumed that you either didn't understand or didn't know how to execute but you've stated that you do therefore I can only surmise that your refusal at this point is intentional and deliberate. I hope that I'm wrong. Everyone, across 4 program offices and 2 line offices is waiting on you in order to have this contract awarded. Please follow the steps I've outlined and release the PR to me in the next 30 minutes.

*Id.* There is no response from Bennett in the record.

At 3:00 p.m., Bennett emailed Gueye that she was taking leave the following two days "for stress."[1] *Id.* at 16. At 4:15 p.m., Bennett emailed Gueye that she was signing off for the day, and she listed "PR conflict" as one of the things she did that day. *Id.* at 18. At 7:08 p.m., Gueye replied, in part:

You were assigned to complete the AFMSS PR by COB today. You did not complete this as assigned and the PR remains unsubmitted in your C-request account. Your claims that my instruction was not clear is not sufficient justification for not engaging with me on completing this high-priority task. I gave you step-by-step screenshot instructions that you should have been able to follow or at a minimum, you should have called me while you took the steps to complete the PR so that I could instruct you verbally. You have successfully completed this type of work before, which makes me question why you could not complete this PR as instructed today even with my detailed instruction. The PR work I assigned you would have only taken you at most 5 minutes to complete, even without my instructions.

Additionally, I am disappointed by your daily check-out email not indicating any disposition of your status in completing the PR work I assigned you as a high-priority nor any notice (separate email or phone call) of your efforts in completing this task as assigned. Instead, you have submitted a no-notice leave request starting tomorrow through the remaining part of this week in conjunction with your RDO on Friday. Due to your failure to complete this PR, I had to intervene and complete your work by re-creating the PR myself. You were on notice [of] the importance of completing this PR today as key stakeholders were waiting for this action to be submitted within the system. As a COR Level 3 employee, you are expected to perform this task. This is inappropriate and I will revisit this matter with you upon your return. For this instance, I will approve your no-notice leave, but please note that this may not be the case in future instances.

---

[1] Earlier in the day, at 12:52 p.m., Bennett advised Gueye she was taking leave on September 17, which Gueye approved at 1:19 p.m. ECF 18-7, at 17.

*Id.* at 18–19.

Nearly a month later, on October 13, 2020, Gueye sent Bennett a "Notice of Proposal to Remove" based on her conduct in September. ECF 18-5. The reason for the proposed removal was "Failure to Follow Supervisory Instruction." *Id.* Specifically:

> On or about September 15, 2020, I instructed you to either (1) complete a procurement request (PR) by adding funding using the appropriate accounting codes or (2) share the incomplete PR with me so that I could complete the PR for you. I instructed you to complete either action by the end of the day of September 15, 2020. You failed to complete the PR by the end of the day on September 15, 2020, and you did not share the incomplete PR with me.

*Id.* at 6.

In his nine-page memorandum justifying the proposed removal, Gueye called Bennett's conduct "extremely serious" with potentially "disastrous consequences" that could have "jeopardize[d] . . . our ability to fulfill our mandate to implement the Magnuson Stevens Act." *Id.* If Gueye had not stepped in to modify the contract, "the contract would have lapsed; causing all work related to [the agency] to cease affecting thousands of fishermen on the East coast." *Id.* at 7. He pointed out that Bennett, as one of "the most experienced CORs within an agency," has "added funding to PRs on numerous occasions, and the assignment [she was] given on September 14, 2020, to add funding to the Automated Fisheries contract was well within [her] experience and expertise." *Id.* at 6. Gueye decided removal was the only option because Bennett knew the task was time-sensitive, she refused to complete the uncomplicated, copy-and-paste task even after Gueye gave her "click-by-click instructions via screenshot" on how to do it, and she even refused to share the PR with Gueye when he asked for it so he could modify the contract himself before it lapsed. *Id.* at 6–7. In deciding to propose removal, Gueye considered Bennett's prior disciplinary history, her 13 years of government service, and her acceptable past performance. Ultimately, Gueye concluded Bennett's actions "irreparably eroded [his] trust in [her] ability to be a good

steward of government resources and in [her] professionalism and dedication to the mission." *Id.*
at 7. Gueye saw "no potential for rehabilitation" or "alternative sanction to deter such misconduct."
*Id.* He requested her removal.[2]

The next day, Bennett submitted a ten-page response to the "Notice of Proposal to
Remove." ECF 18-9. She defended her actions in September. She said, "Gueye failed to provide
clear and concise information about the task" to "make it look as though [she] was incompetent in
carrying the instructions provided." *Id.* at 1. She asserted that her removal would be unlawful
because it came "after years of discrimination, harassment and retaliation against [her] for [her]
initiation and participation in a protect [sic] activity." *Id.* at 2. Bennett alleged that since 2015, she
had been harassed and retaliated against by nearly every supervisor she had. *Id.* She said that OSF
managers were "nefarious" and created a "hostile, harassing, discriminative and retaliatory
environment day in and day out." *Id.* at 3. She theorized that OSF leadership "hired an African
American [Gueye] to carry out the egregious acts against [her] so that it [did] not look like
discrimination" and that a department-wide reorganization plan that removed her position proved
her removal "was planned well in advance." *Id.* at 3, 7.

On December 17, 2020, Kelly Denit, OSF Director, issued a "Decision on Notice of
Proposal to Remove" advising Bennett that her "removal from Federal service [was] fully

---

[2] In Gueye's April 9, 2021 declaration, submitted to the administrative judge presiding over
Bennett's appeal, he recalled his thought process in proposing removal: "[E]very time I went
through the process of thinking through the events of the day and how I, as a supervisor and the
Operations division chief, should respond, I kept concluding that if I proposed a longer suspension
than her most recent one, that it would not be commensurate with the brazen nature of her actions
and the potentially catastrophic consequences she seemed perfectly content with ignoring by going
on leave . . . . [Bennett's lack of communication] was at the forefront of my mind when I decided
to propose removal instead of a long suspension – she chose to simply stop communicating with
me, which showed me that her actions were intentional and not simply a mistake or a
misunderstanding." ECF 18-6, at 13–14.

warranted and would promote the efficiency of service." ECF 18-10, at 5–7. Denit addressed Bennett's responses to the proposed removal notice. *Id.* at 4–6. Denit concluded that Bennett had completed similar tasks many times before "without issue," *id.* at 5, that Bennett knew it was a time-sensitive task that needed to get done, *id.* at 6, and that Bennett had all the information she needed to complete it, *id.* at 5. Bennett had the "funding code, click-by-click screenshots of how to add a new line and what specific text to add in each portion of the [software program], clear information about the deadline, and the option to share the PR with Gueye gave her all of the information she needed to complete the task." *Id.* Gueye had emailed her "step-by-step screenshots of exactly what steps to take and exactly what numbers to fill in." *Id.* at 4. With this information, "even with no other context or training, [Bennett] should have been able to comply with [the] instruction . . . ." *Id.* Even if Bennett was "unsure about how to complete the task, there [was] absolutely no excuse for not sharing the PR with" Gueye. *Id.* Bennett knew how to share the PR because she had "shared PRs with Mr. Gueye before" and he had "explained the need for [her] to share the PR with him before he is able to edit them." *Id.* As for Bennett's retaliation claims, Denit said, "I do not find any validity to your claims of people trying to 'take you down.'" *Id.* at 7. After considering Bennett's disciplinary history, her service to the agency, her lack of remorse and failure to take responsibility for her actions, and the options short of removal, Denit removed Bennett from the agency effective at the end of business, December 17, 2020. *Id.*

### B.  MSPB Appeal and Final Decision

Bennett appealed the removal decision to the MSPB. ECF 18-11, at 1. She disputed she did anything wrong, and she said the penalty of removal was too harsh even if the misconduct allegations were true. *Id.* at 11–12. She said she was removed because she had filed eight EEO complaints in the five years before her removal, and she listed 38 examples of harassment by

Gueye. *Id.* at 12. Bennett said Denit was influenced in her decision by her friendship with Bennett's former supervisor, who had been the subject of at least one of Bennett's EEO complaints. *Id.* at 26–27.

The administrative judge decided the appeal on the written record because Bennett withdrew her request for a hearing at the prehearing conference. *Id.* at 1, 13. The judge limited the record to the exhibits that were submitted with the parties' prehearing submissions or received by March 23, 2021 at 6:00 p.m. *Id.* The judge allowed the submission of witness statements and rebuttal evidence after that date. *Id.* Both parties filed close of record briefs and rebuttals. *Id.* In a 35-page decision, the judge affirmed the agency's removal decision. *See* ECF 18-11.

In so doing, the judge considered an array of evidence submitted by both parties. *See id.* at 13–16. Bennett submitted the following evidence before the close of evidence, which the judge considered: emails between Bennett and former supervisor from 2015; emails from February 2019 "regarding the signing of classification specifications" and Bennett's allegations of fraud; an email exchange in which Bennett questioned the authority of the agency to send office supplies to a contractor's home; Bennett's promotion inquiry from October 2018; and performance management guidelines. *Id.* at 13. The judge did not consider exhibits that Bennett filed late or a declaration that did not have a signature on it. *Id.* at 14.[3]

---

[3] In her close of record pleading, Bennett also submitted: a declaration from Faranak Fouladi, a management analyst with the Client Services Branch in OSF; emails between Bennett and Fouladi; emails between Gueye and others regarding Bennett's "effort to learn about personnel matters with which she had no involvement"; emails between Bennett and a co-worker about Bennett taking over the co-worker's work upon her retirement; emails between Bennett and agency contractor Matt Van Kleunen regarding deactivation and activation of Bennett's email account and Bennett's access to agency computer databases; and emails from August 4, 2020 between Bennett and Gueye regarding a work assignment. *Id.* at 14–15.

The agency submitted, and the judge considered, the email exchanges between Gueye and Bennett from September 2020 and other emails relating to Bennett's work assignments; emails and documents relating to an office reorganization; emails regarding the reactivation of Bennett's computer access after her detail with the Census Bureau; documents concerning Bennett's attempt to access personnel databases she was not entitled to access; Bennett's 2019 performance evaluation, which included input from her supervisor during the Census Bureau detail; and declarations from Gueye, Denit, and Fouladi. *Id.* at 15.

Upon consideration of the evidence, the administrative judge sustained the decision to remove Bennett. First, the judge found that the agency had proven its charge of failure to follow supervisor instructions. *Id.* at 16–21. Marshalling through the evidence, the judge rejected Bennett's defense that she lacked sufficient information to complete the task. *Id.* at 17–18. In so doing, the judge analyzed "whether [Gueye] gave [Bennett] a proper instruction and she failed to follow it." *Id.* at 17. The judge found that Gueye gave Bennett clear and correct instructions to complete the PR, an alternative option to share the PR with him so he could complete the task, and clear notice that time was of the essence. *Id.* at 18, 21–22. The judge noted that Fouladi, a management analyst from the Client Services Branch, reviewed the September 14–15 email exchanges between Bennett and Gueye, attested that Gueye's instructions were accurate, and affirmed that the PR assignment should have taken approximately five minutes. *Id.* at 17.

Second, the administrative judge sustained the agency's penalty decision. *Id.* at 21–24. The judge first considered whether there was a "clear and direct relationship between the articulated grounds for [removal] and either [Bennett's] ability to accomplish her duties satisfactorily or some other legitimate government interest." *Id.* at 21 (citing *Scheffler v. Dep't of the Army*, 117 M.S.P.R. 499, ¶ 9 (2012)). The judge found a nexus between the penalty and the misconduct because Bennett

failed to follow instructions that "were directly related to the performance of her job." ECF 18-11 at 21. The judge then considered whether the agency "considered all of the relevant factors and exercised management discretion within tolerable limits reasonableness." *Id.* (citing *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981)).[4] The judge noted that reversal of a penalty is appropriate only if the agency did not weigh the relevant factors or the agency's "judgment clearly exceeded the limits of reasonableness." *Id.* at 22 (citing *Toth v. U.S. Postal Service*, 76 M.S.P.R. 36, 39 (1997)). Finding the agency did consider the *Douglas* factors, the judge concluded "removal was within the bounds of reasonableness for [Bennett's] sustained misconduct." ECF 18-11, at 24.

Finally, in the bulk of the opinion, the judge considered and rejected Bennett's affirmative defense that she was removed because she had engaged in protected activity by filing several EEO complaints against her supervisors, including Denit and Gueye. *Id.* at 24–35. The judge determined that Bennett's EEO complaints were protected activity. *Id.* at 26. The judge then considered

---

[4] Those factors are: (1) the nature and seriousness of the offense and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Douglas*, 5 M.S.P.R. at 305–06.

Bennett's arguments in support of her position that the removal decision was retaliatory. Each was rejected.

First, Bennett argued that her prior supervisors, who had mistreated her and were the subject of prior EEO complaints, influenced Denit's decision to terminate her. *Id.* at 26–27. The judge found that Bennett did not submit any "evidence to support the speculation that [the former supervisors] were at all involved in the decision to remove" her. *Id.* at 26. The agency submitted evidence, which the judge credited, that Denit did not speak with anyone except human resources about her decision to remove Bennett. *Id.* at 26–27.

Second, the judge rejected Bennett's argument that OSF management had hired Gueye, who is also Black, to allow the agency "to take actions against [her] with impunity." *Id.* at 28. This argument was "based solely on [Bennett's] perception" and unsupported by any evidence. *Id.*

Third, the judge considered Bennett's argument that Denit and Gueye removed her because of her prior EEO activity. *Id.* at 28–29. The judge concluded the removal decision was not motivated by retaliatory animus. The judge found that Gueye, in his sworn statement, wrote "passionately and persuasively about his support for the EEO process having been subjected to discrimination himself in the past." *Id.* at 28. She also noted that Gueye, in his notice of proposed removal, thoroughly explained the reasons for his recommendation and why the penalty of removal was the only option under the circumstances. *Id.* The judge also credited Denit's sworn statement that she did not terminate Bennett because of her EEO activity. *Id.* at 29. The judge concluded there was no evidence that Denit or Gueye removed Bennett in retaliation for filing EEO complaints. *Id.*

Finally, the judge considered Bennett's arguments that Gueye had engaged in a pattern of retaliatory behavior against her. *Id.* at 29–35. The judge found no evidentiary support for the

following allegations: (i) that Gueye gave her a poor performance review, *id.* at 30–31; (ii) that Gueye cut short her Census Bureau detail, *id.* at 31; (iii) that Gueye improperly denied her access to her email and OSF systems during her detail and improperly penalized her for accessing OSF personnel records upon her return to OSF, *id.* at 31–33; (iv) that Gueye improperly issued her a letter of reprimand in December 2019; and (v) that an office restructuring plan was a ruse to enable the agency to remove her. *Id.* at 34.

Ultimately, the judge found Bennett's allegations of retaliation "unsupported by anything but timing." *Id.* at 35. Because Bennett failed to establish her affirmative defense of retaliation, the judge sustained the decision to remove her. *Id.*

Bennett petitioned the MSPB to review the decision. In her petition, Bennett contended the judge was biased against her and abused her discretion because the judge denied three of Bennett's motions: a motion to disqualify the agency's representative; a motion to compel production of the agency representative's work product; and a motion for a subpoena. ECF 18-12, at 2. Bennett also said the administrative judge improperly excluded four of her former coworkers as witnesses. *Id.*

The MSPB, in its June 29, 2022 Final Order, denied the petition for review. ECF 18-12. First, the MSPB found the administrative judge properly denied the motion to disqualify because Bennett had not established a conflict of interest. *Id.* at 3. Next, the MSPB found the judge properly denied the request for production of work product because Bennett did not prove waiver or the crime-fraud exception. *Id.* Finally, the MSPB found the judge did not abuse her discretion by excluding witnesses because Bennett did not object to that ruling below and was precluded from raising it on review, *id.* (citing *Tarpley v. U.S. Postal Service*, 37 M.S.P.R. 579, 581 (1988)), and in any event, the administrative judge had "wide discretion" to exclude witnesses. *Id.* (citing *Franco v. U.S. Postal Service*, 27 M.S.P.R. 322, 325 (1985) and 5 C.F.R. §§ 1201.41(b)(8),

1201.41(b)(10)). Thus, the administrative judge did not abuse her discretion, and the judge's rulings against Bennett—the only alleged basis for bias—did not establish the judge was biased. *Id.* 2–3 (noting that "the administrative judge's conduct during the course of a Board proceeding warrants a new adjudication only if the administrative judge's comments or actions evidence 'a deep-seated favoritism or antagonism that would make fair judgment impossible'" (quoting *Bieber v. Department of the Army*, 287 F.3d 1358, 1362–63 (Fed. Cir. 2002))). Bennett's "mere disagreement with the administrative judge's findings of fact and credibility determinations [did] not warrant further review." *Id.* at 3. The MSPB denied the petition and affirmed the administrative judge's decision, which became the MSPB's final decision. *See generally id.*

### C. Appeal to Federal Circuit and Transfer to this Court

On July 12, 2022, Bennett filed a petition for review of the MSPB's final decision in the United States Court of Appeals for the Federal Circuit. ECF 2, at 8. In her July 18 "Statement Concerning Discrimination," Bennett identified the following discrimination claim:

> The Agency states that I was terminated for not following the supervisor's instructions. That is not true. The Appellant was wrongfully terminated because of EEO activity and filing of her lawsuit in federal court. The Appellant has 8 EEO complaints totally over 100 allegations for repeated retaliation dating back to 2016. All those involved in the termination are named in the Appellant's EEO complaints even the assigned Agency Attorney, Soderstrom. When the Appellant explained this repeatedly to the Judge, she states that she is not there to hear or rule on EEO cases. She disregarded my continuous plea that the termination was in retaliation for her EEO activity.

*Id.* at 28. In an "Informal Brief of Petitioner/Appellant," Bennett alleged that the MSPB failed to take several facts into account, misapplied the law, failed to consider important grounds for relief, and took advantage of her for proceeding without counsel. *Id.* at 30–49.

On August 29, the Federal Circuit issued a show cause order asking why the case should not be transferred to a district court because it is a "mixed case." *Id.* at 160–61. A "mixed case" challenges an agency action reviewable by the MSPB, which the Federal Circuit routinely

considers, and also alleges a violation of federal antidiscrimination laws, which the Federal Circuit does not have jurisdiction to review. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 265–66 (4th Cir. 2001); 5 U.S.C. § 7703(b)(2); *see* 29 C.F.R. § 1614.302(a)(2) (describing "mixed case appeals"). The parties agreed to transfer this "mixed case" to this Court. ECF 2, at 162–69. The case arrived here on November 15, 2022. *Id.* at 218–19.

### D.  Bennett's Complaint

Bennett asserts a Title VII retaliation claim. However, she did not file a traditional complaint. Instead, her complaint is the seven-sentence paragraph in the "Statement Concerning Discrimination," block quoted above. *See id.* at 28. The Court offered Bennett the opportunity to file a traditional complaint during an on-the-record telephonic hearing on July 6, 2023, but she declined and said the "Statement Concerning Discrimination" was her complaint. ECF 36, 37. Thus, the only discrimination claim before the Court is a Title VII retaliation claim.[5]

### E.  The Agency's Motion and the Submission of Evidence

The agency moves to dismiss the complaint for failure to state a claim or, in the alternative, for summary judgment. ECF 18. The agency submitted evidence in support of its motion. ECF 18-4 – 18-13. Bennett has submitted even more evidence than the agency. Before the agency filed the motion, Bennett moved for leave to upload evidence that she claims was not allowed during the administrative proceedings, ECF 6, which the Court granted, ECF 37. After the agency filed its motion, the Court sent Bennett a notice advising her that the motion could be construed as one for

---

[5] In her opposition to the motion for summary judgment, which she filed on March 20, 2023, Bennett states she has alleged a Title VII disparate treatment claim and a whistleblower retaliation claim under 5 U.S.C § 2302(b)(8). ECF 22, at 23, 27. However, these claims are not in her complaint, and Bennett did not seek leave to amend her complaint to add them. Bennett cannot add new claims to her complaint through an opposition brief. *See, e.g.*, *Jassie v. Mariner*, No. DKC-15-1682, 2016 WL 67257, at *7 (D. Md. Jan. 6, 2016). Thus, the only Title VII claim before the Court is the retaliation claim.

summary judgment and could result in dismissal of her complaint. ECF 19. In support of her opposition to the motion, Bennett submitted over a hundred pages of evidence. ECF 22, 24-1 – 24-20, 26-1 – 26-5, 28-1 – 28-2, 33-1 – 33-4. Bennett has not submitted a Rule 56(d) affidavit stating she cannot present facts essential to justify opposition to the motion. *See* Fed. R. Civ. P. 56(d). Thus, the Court is satisfied that Bennett has been advised that the government's motion could be treated as one for summary judgment and that she has been given a reasonable opportunity to present materials in response to the motion. The Court, therefore, will treat the motion as a motion for summary judgment.

Bennett has submitted evidence relating to EEO complaints of harassment, discrimination, and retaliation that she has filed over the years. This includes evidence that she filed the EEO complaints and evidence of her allegations in those complaints. *See, e.g.*, ECF 24-2 (EEO complaint against two former supervisors filed July 15, 2015); ECF 24-1 (EEO complaint against two former supervisors filed December 19, 2015); ECF 24 (EEO complaint against former supervisor filed December 14, 2016); ECF 24-6 (EEO complaint against four former supervisors filed January 16, 2018); ECF 24-7 (EEO complaint against five former supervisors filed August 20, 2018); ECF 24-5 (EEO complaint against Gueye and eight others filed May 13, 2019 and amended November 4, 2019); ECF 24-4 (EEO complaint against Gueye and two others filed March 22, 2020 and amended September 15, 2020); ECF 24-3 (EEO complaint against Gueye, Denit, and two others filed October 21, 2020). In general, Bennett complained that her supervisors and others within the OSF management team created a hostile work environment, discriminated against her based on her race, and retaliated against her for filing EEO complaints. *See* ECF 24-3.

Bennett has submitted other evidence on a range of topics. This evidence includes a table purporting to identify other employees' allegations and observations of a hostile work

environment, ECF 24-8; excerpts from performance review policies, ECF 24-9; Bennett's 2015-16 performance review, ECF 24-10; affidavits from Pamela Sellman (November 5, 2019), Alicia Sims-Reynolds (October 29, 2019), and Kimberlyn Bauhs (November 1, 2019) concerning their knowledge of Bennett's application for a detail position with the Census Bureau, ECF 24-11; emails regarding Bennett's efforts to obtain the Census Bureau detail, ECF 24-12, 24-16; emails showing OSF employees tried to get Bennett to engage in conduct she calls "illegal," ECF 12-13, – 12-15; undated and unsigned statements from James Burgess concerning his experience with Bennett at OSF, ECF 24-17; Bennett's February 27, 2018 communication with the department's service desk alleging her computer files had vanished and attributing the disappearance to her EEO activity, ECF 24-18; a copy of the January 5, 2012 settlement agreement between Bennett and NOAA that resolved five separate EEOC complaints and September 2018 emails in which Bennett alleged the agency had breached the agreement, ECF 24-19; emails regarding Bennett's August 2019 report to the agency's inspector general in which she alleged "wrongdoing taking place within the [OSF]," ECF 24-19; performance reviews and feedback (some of which are undated and unsigned) that Bennett received while at NOAA, ECF 24-20; emails in which fellow OSF employee Christopher Wright alleges an agency representative did not "act[] in good faith," ECF 26-2; excerpts from a July 17, 2018 statement and April 2021 emails from Wright, in which he alleges hostile behavior by OSF employees and supervisors, ECF 33, 33-1; and excerpts from Bennett's EEO proceedings, including a October 7, 2015 statement from a former supervisor, ECF 28.

The Court has reviewed and considered all the evidence Bennett and the agency have presented. Based on this evidence, the Court finds that the MSPB decision should be affirmed and that the agency is entitled to summary judgment on Bennett's retaliation claim.

## II.      Summary Judgment Standard

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S.

519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)).

### III.   Discussion

#### A.  MSPB Decision

Bennett challenges the MSPB's final order sustaining the decision to remove her. The Court's review of the MSPB decision is "very limited." *Mikhaylov v. Dep't of Homeland Sec.*, 62 F.4th 862, 868 (4th Cir. 2023); 5 U.S.C. § 7703(c). "The Court must affirm the MSPB decision unless the Court finds the decision to be '(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence.'" *Hooven-Lewis v. Caldera*, 249 F.3d 259, 266 (4th Cir. 2001) (quoting 5 U.S.C. § 7703(c)). The Court's review of the decision is confined to the administrative record. *Rupert v. Geren*, 605 F. Supp. 2d 705, 713 (D. Md. 2009) (citing 5 U.S.C. § 7703(c)). The appellant bears the burden of establishing the MSPB decision should be reversed. *Harris v. Dep't of Vet. Aff's*, 142 F.3d 1463, 1467 (Fed. Cir. 1998).

Bennett has not clearly enumerated the reasons why she contends the MSPB's decision should be reversed. Nonetheless, the Court has carefully reviewed her 40-page opposition to the motion for summary judgment, and it appears that Bennett challenges the decision on four grounds: (i) the decision was not supported by substantial evidence, *see generally* ECF 22; (ii) the administrative judge did not allow her to submit evidence relating to her prior EEO complaints

and did not consider her affirmative defense of retaliation, *id.* at 4, 28, 31; (iii) the administrative judge and the MSPB were biased against her, *id.* at 16–18; and (iv) the attorney representing the agency should have been disqualified from the case, *id.* at 18. The Court addresses each ground in turn. None has merit.

### 1. Substantial evidence

Bennett contends that the MSPB's decision was unsupported by substantial evidence. *Id.* at 17, 20, 33–34, 38. Bennett is incorrect. Substantial evidence supports the decision.

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed. Cir. 1996) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The MSPB's decision must be upheld if it is supported by "more than a mere scintilla" of evidence. *Mikhaylov*, 62 F.4th at 869 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

Start with the finding that Bennett did not follow the instructions of her supervisor, Gueye. ECF 18-11, at 4–5, 17–18. In support of this finding, the administrative judge cited emails showing Gueye explained to Bennett how to complete the task and that he sent her screenshots detailing how to do it. *Id.* at 17–18; *see also* ECF 18-7. The judge relied on a sworn declaration from Gueye that Bennett knew how to do the task, that she had done it many times before, and that the simple task should have taken a mere five minutes. ECF 18-11, at 5; *see also* ECF 18-6. The judge also cited emails from Gueye asking Bennett to share the PR so he could complete the task himself, which Bennett never did. ECF 18-11, at 18–19; *see also* ECF 18-7, at 11. Finally, the judge relied on an email from Bennett signing off at 4:15 p.m. without having completed the time-sensitive task. ECF 18-11, at 18–19; *see also* ECF 18-8. A "reasonable mind" could accept this evidence as

adequate to support the conclusion that Bennett did not follow her supervisor's instructions. *Frederick*, 73 F.3d at 352.

Bennett says she could not complete the task because Gueye refused to provide information that she requested from him. ECF 22, at 11, 14, 30–31. The administrative judge considered and rejected this argument. The judge found that, "based on the email chain, which began on September 14, 2020, [Bennett] had received all the necessary information to complete the assignment she needed that day, namely the amount of funding to be added, the accounting code and where to add the funding." ECF 18-11, at 17. The judge cited the testimony of OSF Client Services Specialist Faranak Fouladi, who reviewed the emails from September 14–15, 2020 and confirmed Gueye's instructions were clear and accurate and that the task would have taken approximately five minutes to complete. *Id.* Based on the emails and the Fouladi declaration, the judge concluded that Gueye gave Bennett "clear and proper instructions, which she failed to follow even after being given step-by-step instructions" and that Bennett did not need the information she requested to complete the task. *Id.* at 18. Thus, there was substantial evidence for this finding.

Even if that finding were erroneous, which it is not, there was an alternative ground for finding Bennett did not follow Gueye's instructions: Bennett did not share the PR with Gueye when he asked her to. *Id.* at 18–19. This finding also was supported by substantial evidence. Fouladi stated that Gueye did not have the ability to edit the PR unless Bennett released it to him. *Id.* at 19. Bennett knew that Gueye could not edit the PR unless she released it to him, because in June 2020, Fouladi had emailed Bennett that the PR must be shared with someone to allow them to make changes to it. *Id.* Bennett offered no evidence that she sent Gueye the PR as he requested or that Gueye could modify the contract without having access to the PR. Thus, the administrative

judge's finding that Bennett failed to follow Gueye's instructions was supported by substantial evidence.

Next, the Court examines the finding that removal was within the limits of reasonableness. *Id.* at 21–22. This finding, too, was supported by substantial evidence. The judge relied on the fact that Denit and Gueye, in making their decisions, discussed the *Douglas* factors and accounted for the "seriousness of the offense" and "the fact that the misconduct was job related, intentional and caused the agency to lose trust in" Bennett. *Id.* at 22. The judge credited the declarations of Denit and Gueye in which they reiterated their reasons for the removal decision. *Id.* The judge found their consideration of Bennett's prior discipline "not clearly erroneous," because the disciplinary records showed Bennett had, in fact, been disciplined and the "agency's prior discipline satisfied the administrative process requirements." *Id.* at 23. Finally, the judge cited the fact that Bennett "has not accepted responsibility for her misconduct or acknowledged that she did anything wrong." *Id.* at 24. Based on this and other evidence, the judge found that removal was within the bounds of reasonableness. This finding was supported by substantial evidence.

Bennett disagrees that removal was within the bounds of reasonableness because she was not on a performance improvement plan ("PIP"). ECF 22, at 15, 32. There is no legal requirement that an employee must be placed on a PIP before they may be removed. Bennett may disagree with the MSPB's determination that the decision to remove her was within the bounds of reasonableness, but that is no reason for reversal. *Frederick*, 73 F.3d at 352.

Finally, the Court considers the finding that Bennett was not terminated in retaliation for her EEO activity. Bennett strongly disagrees with this finding. ECF 22, at 6–7, 15–16. Bennett argued below, as she argues here, that Gueye and Denit removed her because she had filed several EEO complaints against them and other supervisors over the years. *See* ECF 18-11, at 26–35. The

administrative judge concluded that Denit and Gueye did not remove Bennett in retaliation for her EEO activity. *Id.* The judge credited Gueye's and Denit's statements that they did not "take action against" Bennett because of her protected activity. *Id.* at 28-29. The judge identified the specific reasons why she found their statements credible, which included: that Gueye "wrote passionately and persuasively about his support for the EEO process having been subjected to discrimination himself"; that Gueye proposed removal because "he believed it was the appropriate action based on her misconduct"; that Denit sought additional information about Bennett's response to the proposal notice, allowed Bennett to respond to that information, and then made her decision without "merely disregarding" Bennett's response. *Id.* The judge relied on Gueye's declaration, emails, disciplinary records, and other evidence to find Gueye had not engaged in a pattern of retaliatory behavior against Bennett. *Id.* at 29–34. These credibility determinations "are virtually unreviewable on appeal." *Bieber v. Dep't of Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002) (quoting *Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1149 (Fed. Cir. 1997) ("As an appellate court, we are not in [a] position to re-evaluate these credibility determinations, which are not inherently improbable or discredited by undisputed fact.")). A reasonable mind could accept this evidence as sufficient to conclude that Denit and Gueye did not remove Bennett because of her prior EEO activity. This finding was supported by substantial evidence.

The MSPB's decision was supported by substantial evidence.

### 2.   Refusal to accept evidence or consider retaliation defense

Bennett next argues that the administrative judge did not allow her to introduce evidence relating to her EEO claims and did not consider her affirmative defense that she was terminated in retaliation for her EEO activity. ECF 22, at 31–33. The Court construes these arguments to allege procedural errors. Reversal of an MSPB decision for procedural errors is warranted if the employee

can show "harmful error in the application of the agency's procedures in arriving at [the] decision." 5 U.S.C. § 7701(c)(2)(A). Harmful error means "[e]rror by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error." 5 C.F.R. § 1201.4(r).

The administrative judge considered evidence of Bennett's prior EEO activity. ECF 18-11, at 26 (citing, among other things, Bennett's district court pleading outlining her "other EEO complaints dating back to 2015 and continuing through 2018"). Bennett argues the judge did not allow her to introduce evidence of the allegations underlying those prior EEO complaints. Even if that was true, the judge had wide latitude in deciding which evidence to consider and which evidence to exclude. 5 C.F.R. § 1201.41(b)(8); *Franco v. U.S. Postal Serv.*, 27 M.S.P.R. 322, 325 (1985) (noting administrative judges possess wide discretion to control hearings, including the authority to exclude witnesses offering irrelevant, immaterial, and repetitious evidence). Bennett has not shown that the judge abused her discretion in excluding this evidence or that the excluded evidence would have changed the outcome.

Bennett argues the administrative judge did not consider her affirmative defense of retaliation. The judge did. Extensively. ECF 18-11, at 24–35. The judge agreed with Bennett that she previously had engaged in protected EEO activity. *Id.* at 26. The judge then evaluated the evidence to determine whether the decision to remove her was in retaliation for that protected activity. *Id.* at 28–35. In the judge's estimation, it was not. *Id.* at 28–31. The judge's disagreement with Bennett is not evidence that the judge refused to consider her retaliation defense.

Bennett has not shown that the MSPB committed a "harmful error" in the application of its procedures in arriving at its decision.

### 3.   MSPB and administrative judge bias

Bennett contends that the administrative judge and the MSPB were biased against her. ECF 22, at 4, 16–17, 38. To succeed on this claim, Bennett must demonstrate that they engaged in "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Bieber*, 287 F.3d at 1362 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

The MSPB considered Bennett's bias allegations against the administrative judge and found them meritless. ECF 18-12, at 2–4. Bennett does not argue this finding violates 5 U.S.C. § 7703(c). Rather, Bennett says the judge was biased because the judge concluded Bennett's detail to the Census Bureau was terminated for poor performance, a fact that Bennett disputes. ECF 22, at 4–5. Even if Bennett had raised this particular bias claim in her petition to the MSPB—it is not clear she did—the judge's finding that Bennett's detail was cut short because of Bennett's poor performance was supported by substantial evidence. *See* ECF 18-11, at 31 (crediting the sworn statement of Bennett's detail supervisor who said she alone ended the detail early and did so because of Bennett's performance). Just as the MSPB found Bennett's disagreement with the judge's findings was not a reason to conclude the judge was biased, the Court finds the same here. *See* 5 C.F.R. § 1201.56(c)(3).

Shifting her attack to the MSPB, Bennett claims the board rejected her petition because she was unrepresented by counsel. ECF 22, at 20–21. There is nothing in the record indicating the MSPB was biased against Bennett because she did not have counsel. The MSPB considered Bennett's arguments in her petition for review and cited law and record evidence to support the decision to deny the petition.

Bennett has not identified a shred of evidence that the MSPB or the administrative judge engaged in "a deep-seated favoritism or antagonism" that rendered their ability to make "fair

judgment impossible" in her case. *See Bieber*, 287 F.3d at 1362. Bennett's claims of bias on the part of the judge and the MSPB are unfounded. The MSPB decision will not be set aside on this ground.

### 4.  Alleged attorney misconduct

Bennett claims the lawyer representing the agency engaged in misconduct and should have been disqualified. ECF 22, at 17–20. Bennett contends that, in 2018, the same lawyer prevented her from preparing for EEO matters, in an unrelated case, during business hours and on "official time." *Id.* at 17–18. Bennett next argues that agency counsel engaged in "witness tampering." *Id.* at 18. Finally, Bennett argues that agency counsel conducted herself improperly during the deposition of Chris Wright by asking him irrelevant questions. *Id.*

Bennett raised these allegations of attorney misconduct in a motion to disqualify, which the administrative judge denied and the MSPB affirmed. ECF 18-12, at 3. Bennett may disagree with the decision not to disqualify agency counsel, but she does not explain how the denial of the motion to disqualify warrants reversal of the MSPB decision on any of the grounds in 5 U.S.C. § 7703(c). The Court finds no legal error in the ruling on the disqualification motion that would justify disturbing the MSPB decision.

After carefully reviewing the record and the parties' submissions, the Court finds no reason to reverse the MSPB's final decision. Accordingly, the Court grants summary judgment to the agency. The MPSB's final decision is affirmed.

### B.  Title VII Claim

Bennett asserts a Title VII retaliation claim based on essentially the same facts. She alleges she was removed from her position in December 2020 because she had filed several EEO

complaints alleging Title VII violations and a Title VII lawsuit.[6] Even though the MSPB rejected

her retaliation defense, the Court reviews the retaliation claim *de novo*. *E.g.*, *Ridgell v. Colvin*, No.

DKC-10-3280, 2013 WL 952253, at *10 (D. Md. Mar. 11, 2013) (citing 5 U.S.C. § 7703(c)).

"Title VII prohibits an employer from retaliating against an employee for complaining

about prior discrimination." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021)

(citing *Foster v. Univ. of Md. – E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)). Under Title VII, it is

unlawful for an employer to take any action against an employee "because [s]he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under"

the Act. 42 U.S.C. § 2000e-3(a).

A plaintiff may prove a Title VII retaliation claim through direct evidence of retaliatory

animus or through the *McDonnell Douglas* burden-shifting framework. *Foster*, 787 F.3d at 249;

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Bennett does not rely on direct evidence

of retaliation. She has not identified any conduct or statements that directly reflect retaliatory

animus motivated the removal decision. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir.

2013) ("Direct evidence encompasses conduct or statements that both (1) reflect directly the

alleged retaliatory attitude, and (2) bear directly on the contested employment decision.").

Without any direct evidence, Bennett must proceed through the *McDonnell Douglas*

burden shifting-framework. First, Bennett must establish a prima facie retaliation claim. "The

elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected

activity; (2) adverse employment action; and (3) a causal link between the protected activity and

---

[6] The lawsuit is *Bennett v. Raimondo*, No. 20-3428-CBD, which Bennett filed in this court on September 7, 2018. There, she alleged, among the things, that her supervisors subjected her to a hostile work environment because of her race. The court granted summary judgment for the agency, and the Fourth Circuit affirmed. *See Bennett v. Raimondo*, No. 22-1397, 2022 WL 4129269, at *1 (4th Cir. Sept. 12, 2022), *cert. denied*, 143 S. Ct. 1066 (2023).

the employment action." *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010); *Foster*, 787

F.3d at 250; *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011). After a prima facie case is

made, the burden shifts to the employer to show that it took the adverse action for a legitimate,

nonretaliatory reason. *Foster*, 787 F.3d at 250; *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397,

407 (4th Cir. 2005). If the employer makes this showing, the burden shifts back to the plaintiff to

rebut the employer's evidence by demonstrating the employer's purported nonretaliatory reasons

were pretext for discrimination. *Foster*, 787 F.3d at 250. Ultimately, "Title VII retaliation claims

require proof that the desire to retaliate was the but-for cause of the challenged employment

action." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017) (quoting *Univ. of Tx.*

*Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

      Begin with the prima facie case for retaliation. Bennett has submitted evidence that she

engaged in activity protected under Title VII by filing EEO complaints alleging racial

discrimination, harassment, and retaliation and an employment discrimination lawsuit. *See* ECF

22, at 29; ECF 24 – 24-7. Her removal was an adverse employment action. As for showing a causal

link between the protected activity and the removal, the burden on Bennett at this stage is not

heavy. *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 335 (4th Cir. 2018) ("[E]stablishing a 'causal

relationship' at the prima facie stage is not an onerous burden."). "Purported victims of retaliation

do not have to show at the prima facie stage that their protected activities were but-for causes of

the adverse action." *Id.* (citing *Foster*, 787 F.3d at 251). "An employee may satisfy his burden

simply by showing that (1) the employer either understood or should have understood the

employee to be engaged in protected activity and (2) the employer took adverse action against the

employee soon after becoming aware of such activity." *Id.* at 335–36. Applying this standard, the

Court finds that Bennett has met the low threshold for showing a causal link. Bennett offers

evidence that she filed at least eight EEO complaints against her supervisors between July 12, 2015 and October 21, 2020, including three against Gueye filed on May 13, 2019, March 22, 2020, and October 21, 2020, and one against Denit filed on October 21, 2020. Gueye issued the notice of proposal to remove on October 13, 2020, and Denit issued the removal decision on December 17, 2020. From this timeline, a reasonable juror could find that Gueye was aware of Bennett's EEO activity before he issued the notice of proposal to remove and that Denit was aware of her protected activity before she made the final decision to remove.[7] The temporal proximity between Bennett's EEO activity and her removal could suggest a causal link between them. *See Roberts*, 998 F.3d at 126–27. Bennett, therefore, has met the low threshold to show causation at this stage.

The agency responds with a legitimate nonretaliatory reason for removing Bennett: her failure to follow her supervisor's instructions. The agency has offered a mountain of evidence that Bennett did not complete a time-sensitive, mission-critical task she knew how to do and had done many times in the past. Even when her supervisor gave her accurate, detailed step-by-step instructions on how to do it, she refused. And when Bennett insisted she could not complete the task because Gueye was withholding information she thought she needed, Bennett easily could have resolved the problem by sharing the PR with him as he requested. She refused to give it to him and logged off for the day without completing the important, time-sensitive task. Because of her refusal to follow her supervisor's instructions, Bennett was removed from federal service. This legitimate nonretaliatory reason for removal is supported by extensive evidence.

Now, the burden shifts back to Bennett to establish that the "purported nonretaliatory reasons were not [the agency's] true reasons but were a pretext for discrimination." *See Strothers*,

---

[7] The Court assumes, without deciding, that both Denit and Gueye were the decisionmakers. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004).

895 F.3d at 328 (citing *Foster*, 787 F.3d at 250). Bennett must offer evidence from which a reasonable jury could conclude her protected activity was the "but-for" cause of her removal. *See Foster*, 787 F.3d at 253–54; *see also Villa*, 858 F.3d at 900–01; *Walton v. Harker*, 33 F.4th 165, 178 (4th Cir. 2022). She offers none.

Bennett says Denit and Gueye knew about her many EEO complaints and her discrimination lawsuit and those protected activities, therefore, must have been the real reason she was removed. Even if Denit and Gueye were aware of Bennett's extensive history of filing EEO complaints and her employment discrimination lawsuit when they removed her, that knowledge alone does not counter the substantial evidence of their legitimate, nonretaliatory reasons for removing her. *See Williams v. Cerberonics, Inc*., 871 F.2d 452, 457 (4th Cir. 1989) ("[M]ere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee."), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

Bennett also argues that office leadership historically was hostile towards its employees and towards her in particular. As evidence, Bennett submits a table, dated June 18, 2018, whose source is unidentified, that lists the names of other employees and purports to describe hostile work environment allegations that the employees experienced or witnessed. ECF 24-8. The table includes an entry that Denit was engaged in "ongoing harassment/retaliation." *Id.* at 6. Bennett also points to a July 2018 declaration of another employee, Christopher Wright, in which Wright states that "office leadership" was hostile to staff, engaged in "ruthless attacks" on staff's integrity, and engaged in "retaliation." ECF 33, at 4–6. Neither the table nor Wright's declaration—both apparently from 2018—remotely suggest the actual reason that Denit and Gueye terminated

Bennett in 2020 was because she had filed EEO complaints or a discrimination lawsuit. At most, these documents suggest other employees witnessed and she experienced workplace harassment in 2018 or earlier. That does not raise a genuine dispute of material fact that the reasons for Bennett's removal in 2020 were pretext for discrimination.

Bennett appears to argue that Gueye intentionally withheld information that she needed to complete the task and that his refusal to give her the necessary information was part of an agency scheme to fire her for her prolific EEO filings. ECF 22, at 10–14. No evidence supports this theory of retaliatory animus. Bennett says that to complete the contract modification request, she needed to know "the breakdown [of] the funding in percentages," *id.* at 10, and that Gueye refused to give it to her. *Id.* But she offers no evidence that she needed this information or that Gueye believed she needed this information. In her opposition brief, Bennett inserts screenshots of excerpts from undated emails that appear to be from Faranak Fouladi, the management analyst from the Client Services Branch at OSF, concerning the contract funding modification process. *Id.* at 10–11. But nothing in these excerpts shows that Bennett did not have the information she needed to complete the task when Gueye asked her to do it. They certainly do not show Gueye intentionally withheld necessary information from her. The agency, on the other hand, offers substantial evidence from multiple sources that Bennett had all the information she needed. And the contemporaneous emails show that Gueye gave Bennett all the information she needed to get the job done. Gueye even sent her highlighted screenshots with click-by-click instructions on what to do—hardly evidence that he wanted Bennett to fail at her job because he harbored retaliatory animus against her. Even if Bennett truly believed she needed additional information, she offers no evidence to explain why she did not simply send Gueye the PR so that he could complete the task himself. There is no

evidence to support Bennett's theory that Gueye intentionally withheld information from her to concoct a basis for firing her.

The notion of pretext in this case is "dispelled by the fact that" the agency's explanations for the reasons why Bennett was removed "have been consistent throughout." *Lashley v. Spartanburg Methodist College*, 66 F.4th 168, 177 (4th Cir. 2023). Gueye and Denit have consistently explained they decided to remove Bennett because she refused to follow her supervisor's instructions. *See id.* ("A straight and consistent line of explanation is more persuasive than one which wanders here, there, and yonder."). An inconsistent explanation would be "probative of pretext," but there is no sign of it here. *E.E.O.C. v. Sears Roebuck*, 243 F.3d 846, 852–53 (4th Cir. 2001).

Bennett has offered no evidence that contradicts the agency's legitimate, nonretaliatory reason she was removed or suggests the real reason for her removal was her protected activity. *See King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003). The undisputed evidence shows the agency's reason for removing Bennett from federal service—her refusal to follow her supervisor's instructions—"truly was the reason." *See Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014). Based on the record before the Court, no reasonable jury could conclude that Bennett was terminated for any other reason. The agency is entitled to summary judgment on Bennett's Title VII retaliation claim.

## IV.    Conclusion

The defendant's motion for summary judgment, ECF 18, is granted. The MSPB's final order is affirmed. The defendant is granted summary judgment on the Title VII retaliation claim. A separate order follows.

Date: March 31, 2024

Deborah L. Boardman
United States District Judge